THE PEOPLE *ex rel.* William C. Malley

*v.*

THOMAS E. BARRETT, Sheriff.

*Opinion filed June 16, 1903.*

1. HABEAS CORPUS—*when party is entitled to be discharged on habeas corpus.* One committed for contempt of court in disobeying an injunction is entitled to be discharged on *habeas corpus* if the court was without jurisdiction to issue the injunction.

2. EQUITY—*equity has no jurisdiction over political rights.* A court of equity has no jurisdiction to enjoin an election board and its clerk from producing, counting and canvassing ballots in obedience to a *subpœna duces tecum* issued by the tribunal authorized by law to try a contested election.

3. SAME—*right to public office is not a property right, which equity can protect.* While an officer *de jure* has a property right in the emoluments of his office, yet his right to hold the office is not a property right, which a court of equity can protect by injunction.

4. EVIDENCE—*production of ballots on contest does not destroy their probative force.* The production of ballots in a contest does not destroy the force of such ballots as evidence in a subsequent contest, but merely renders it necessary to make proof that they have not been tampered with.

ORIGINAL petition for *habeas corpus.*

This is a petition for a writ of *habeas corpus*, filed in this court at its April term, 1903, by William C. Malley, to be discharged from the custody of Thomas E. Barrett, sheriff of Cook county, in whose custody he then was by virtue of an order of commitment issued by the circuit court of said county in a certain chancery suit therein pending, wherein one William Lorimer was complainant and William C. Malley and others were defendants, adjudging him guilty of contempt of court for having violated an injunction issued by said circuit court in said chancery suit.

The record shows that William Lorimer and Allan C. Durborow were opposing candidates for the office of representative in Congress for the sixth Congressional

district of Illinois, at the general election of 1902; that on the canvass of the votes cast at said election Lorimer was held to be duly elected, and a certificate of election was issued to him in due form by the Governor of the State; that Durborow duly served a notice of contest upon Lorimer, and Lorimer filed an answer thereto, whereupon Durborow, under the statutes of the United States providing for the taking of evidence in such contests, selected one Frederick S. McClory, a notary public in said county residing in said Congressional district, before whom to take the evidence in said contest; that said notary, at the instance of Durborow, issued a *subpœna duces tecum* directed to William C. Malley, Thomas F. Judge and Oscar Hebel, who were then the acting election commissioners and composed the board of election commissioners of the city of Chicago in said county, and Isaac N. Powell, the chief clerk of said board, commanding each of them to attend before him, as such notary, at the hour of nine o'clock A. M., February 3, 1903, in the room usually occupied by said board of election commissioners in the City Hall of the city of Chicago, to testify and give evidence in said election contest between Allan C. Durborow and William Lorimer on behalf of said Durborow, and that they bring with them all the ballots cast for representative in Congress for the sixth district of Illinois at the several polling places in said district at the general election held in said district on November 4, 1902; also all the statements of the results of the canvass of the votes, or election returns, of each of the election precincts in said district, together with all the tally-sheets kept at each election precinct at said election, together with all copies, drafts, books and vouchers relating to the said documents and papers, and all other paper writings, books or printed matter whatsoever that would afford any information or evidence in said contest. Thereupon Lorimer filed a bill in chancery in the circuit court of Cook county against said William

C. Malley, Thomas F. Judge and Oscar Hebel, the board of election commissioners of the city of Chicago, and Isaac N. Powell, the chief clerk of said board, to enjoin them from obeying said subpœna and from producing before said notary said ballots, returns, tally-sheets, etc., and upon said bill being presented to one of the judges of said court an injunction was ordered to issue as prayed for therein and without notice to the defendants. Upon the writ being served the defendants appeared before the judge who ordered said writ to issue, and challenged the jurisdiction of the court and the right of said judge to order said writ to issue, and moved to dissolve the injunction, which motion was denied, whereupon the defendants, having been advised that the court was without jurisdiction and said writ therefore void, obeyed said subpœna by producing before said notary the ballots, returns, tally-sheets, etc., of one precinct of said district, and the ballots were, in the presence of said board of election commissioners and said chief clerk, opened and re-counted and copies made thereof by said notary. An affidavit was then filed in said cause advising said judge of the action of the board of election commissioners and its chief clerk, and they were thereupon each ruled to show cause why they should not be punished as for a contempt of court in disregarding and disobeying said writ of injunction. Defendants appeared in court, with counsel, and filed an answer, in which they disclaimed any disrespect for the authority of the court, but again challenged the jurisdiction of the court to entertain said bill, to make said order, to issue said writ of injunction or to punish said defendants, or either of them, for a violation of said injunction. The court held their answers to be insufficient and adjudged them severally to be in contempt of court, and ordered that they each pay a fine of $100, and that they stand committed. The defendants, and each of them, having failed and refused to pay said fine, they were severally committed

to the custody of the sheriff of said county and by him confined in the county jail of said county. The several defendants in said chancery suit thereupon, by leave of court, filed their respective petitions in this court for a writ of *habeas corpus.* As the facts and legal principles involved are identical in all of said cases, an opinion in one case only will be filed.

W. W. WHEELOCK, LEVY MAYER, and JOHN H. HAM-LINE, for relator.

WILLIAM T. UNDERWOOD, and DELAVAN B. COLE, (ALBERT J. HOPKINS, of counsel,) for respondent.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

The only question involved in this case is, did the circuit court have jurisdiction in the chancery case to which the contempt proceeding was supplementary, of the parties thereto and the subject matter therein involved, and power to enter the order granting the writ of injunction? If the court had jurisdiction of the parties and the subject matter of that suit, and power to order that the injunction issue, the relator cannot question the validity of the order committing him for contempt for violating the injunction, by *habeas corpus,* as that would be to attack the order collaterally, which cannot be done where the court has jurisdiction and is authorized to act. If, however, the court did not have jurisdiction of the parties or of the subject matter of said suit it was not authorized to act, and its order granting the writ of injunction was void, and the relator may be discharged by *habeas corpus.*

In *People* v. *Murphy,* 188 Ill. 144, on page 148, it was said: "It is well understood that a person imprisoned under the sentence of a court having jurisdiction of the subject matter and person of the defendant, and power to render the judgment, cannot be discharged on *habeas*

*corpus* because of irregularities in the proceedings under which he is convicted, his remedy in such case being by writ of error.    It is only when the judgment of conviction is void that a court will discharge a petitioner on *habeas corpus.*"    In *In re Sawyer*, 124 U. S. 200, an injunction to enjoin a removal from office was issued by the United States circuit court.    The injunction was disobeyed and Sawyer was adjudged guilty of contempt.    He applied direct to the Federal Supreme Court and was discharged on *habeas corpus.*    The court said (p. 221): "The circuit court being without jurisdiction to entertain the bill in equity for an injunction, all its proceedings in the exercise of the jurisdiction which it assumed are null and void.    The restraining order, in the nature of an injunction, it had no power to make.    The adjudication that the defendants were guilty of contempt in disregarding that order is equally void.    Their detention by the marshal under that adjudication is without authority of law, and they are entitled to be discharged."    It is conceded here that the court had jurisdiction of the parties.    The contention is therefore narrowed to the consideration of whether the court had jurisdiction of the subject matter of the suit.

In *Marshall* v. *Board of Managers of the Illinois State Reformatory*, 201 Ill. 9, on page 15 this court said: "It is elementary that the subject matter of all chancery jurisdiction is property and the maintenance of civil rights, and that matters of a political character do not come within its jurisdiction."    And in *Sheridan* v. *Colvin*, 78 Ill. 237, on page 247: "The subject matter of the jurisdiction of the court of chancery is civil property.    The court is conversant only with questions of property and the maintenance of civil rights.    Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests.    The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property.    Nor do matters of a polit-

ical character come within the jurisdiction of the court of chancery. Nor has the court of chancery jurisdiction to interfere with the public duties of any department of government, except under special circumstances and where necessary for the protection of rights of property."

We think it apparent that the entire scope and object of the bill filed by Lorimer·against the board of election commissioners and its chief clerk were for the assertion and protection of political, as distinguished from civil, personal or property rights. In *Fletcher* v. *Tuttle*, 151 Ill. 41, the distinction between a political and civil right was pointed out. A political right is defined by Anderson to be "a right exercisable in the administration of government," while a civil right is said to be "a right accorded to every member of a distinct community or nation." (Anderson's Law Dic. p. 905.) And Bouvier says: "Political rights consist in the power to participate, directly or indirectly, in the establishment or management of government." "Civil rights are those which have no relation to the establishment, support or management of the government. These consist in the power of acquiring and enjoying property, of exercising the paternal and marital powers, and the like." (2 Bouvier's Law Dic. p. 485.) The objects sought by said bill were to retain an office, to prevent a public officer charged by law with the performance of a public duty from performing that duty, and to substitute the control of a court of chancery over the election machinery of the city of Chicago and give to it custody of the ballots, returns and tally-sheets, etc., of elections held in that city, instead of the board of election commissioners designated by law to perform those offices. These matters involve, in themselves, no property rights, but pertain solely to the political branch of the government and cannot be controlled by a court of chancery.

In *Fletcher* v. *Tuttle, supra,* a bill in chancery was filed by Fletcher to test the constitutionality of the Apportion-

ment act of 1893, and incidentally to enjoin the county clerk of Vermilion county from issuing or causing to be posted notices of election calling an election for members of the House of Representatives for the eighteenth Senatorial district under said act, and it was held that a court of chancery had no jurisdiction in such state of case, as the questions involved were purely political and did not involve a property or civil right. On page 57 the court said: "Wherever the established distinctions between equitable and common law jurisdiction are observed, as they are in this State, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political and where no civil or property right is involved. In all such cases the remedy, if there is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery can not, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office. Nor can it be invoked for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. These matters involve, in themselves, no property rights, but pertain solely to the political administration of government. If a public officer charged with political administration has disobeyed or threatens to disobey the mandate of the law, whether in respect to calling or conducting an election, or otherwise, the party injured or threatened with injury in his political rights is not without remedy. But his remedy must be sought in a court of law, and not in a court of chancery."

In *Dickey* v. *Reed,* 78 Ill. 261, an election was held in the city of Chicago to determine whether that municipality would change its charter. A bill was filed against the members of the common council and the city clerk, in which it was alleged that there was no proper sub-

mission of the proposition to a vote of the people; that
the election was therefore void; that a large number of
illegal and fraudulent votes had been cast; that a large
number not actually cast were deposited in the ballot-
boxes; that in some of the wards there were no polling
lists and no clerks; that the judges of election were
about to return their canvass of the votes, including the
illegal and fraudulent votes so cast. A temporary in-
junction was ordered, restraining the city council from
canvassing the returns. This injunction was disobeyed
by the members of the city council on the ground that
the injunction was void because the court issuing the
same had no jurisdiction of the subject matter of the
bill. Mr. Justice WALKER, in speaking for the court, on
page 266 said: "It is urged by appellants that the court
below had no power to entertain jurisdiction of the case
or to issue the writ, and that all which followed the
filing of the bill was utterly void; that the want of
power to entertain a bill in such a case, or to make the
restraining order, rendered the whole proceeding void
and of no effect, and, being void, appellants had the
right to disregard its requirements and to proceed to
the performance of a plain duty required of them by
the statute, although in violation of the restraining or-
der of the court." And again, on page 271: "It has been
held that a court of equity has no power to try a con-
tested election, even where the statute has not provided
a mode for contesting. (See *Moore* v. *Hoisington,* 31 Ill.
243.) Elections belong to the political branch of the
government and are beyond the control of the judicial
power. It was not designed, when the fundamental law
of the State was framed, that either department of gov-
ernment should interfere with or control the other, and
it is for the political power of the State, within the lim-
its of the constitution, to provide the manner in which
elections shall be held, and the manner in which officers
thus elected shall be qualified and their elections con-

tested. And the political power of the State may organize municipal bodies and put them into operation by the force of enactment or by election by the people to be thus governed, and they can provide the mode of reviewing the returns of all elections, to ascertain whether they are in accordance with the expressed will of the people, and until the courts are empowered to act, by the constitution or legislative enactment, they must refrain from interference. But did the court have a general power to hear and determine as to the fairness of the result of elections in this class of cases, on the requisite facts being stated in the bill? If so, then the court had power over the subject matter, although the facts were so defectively stated as to fail to confer jurisdiction in the particular case. We think, clearly not, because no state of facts, however stated, could confer power to adjudicate in that class of cases. We are aware of no adjudged case or text writer who has ever announced the power as inherent in the courts of equity to try contested elections between persons claiming an office, or in a case of this character."

In *Harris* v. *Schryock*, 82 Ill. 119, it was held that "the power to hold an election is political, and not judicial," and that "a court of equity has no jurisdiction to restrain officers from the exercise of such power."

In *Delahanty* v. *Warner*, 75 Ill. 185, it was held that a court of equity had no jurisdiction to entertain a bill to enjoin the mayor and aldermen of a city from removing a party from an office and appointing a successor, and from preventing the party from discharging his duties after removal by them, as the party's remedy at law is complete by *quo warranto* against the successor or by *mandamus* against the mayor and councilmen.

In *In re Sawyer*, *supra*, the court said: "The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution,

the punishment or the pardon of crimes or misdemeanors or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses or for the removal of public officers, is to invade the domain of the courts of common law or of the executive or administrative department of the government."

From a diligent search of the text books and digests we have been unable to find a single case which sustains the position that the rights sought to be enforced by said bill in chancery were other than political, or one which sustains the position that a court of chancery may grant an injunction to protect the party in the enjoyment of a political right or to assist him in acquiring such right, the trend of all the authorities being in accord with the statement of Mr. Chief Justice Fuller in *World's Columbian Exposition* v. *United States*, 56 Fed. Rep. 654, that "the office and jurisdiction of a court of equity, unless enlarged by express statutes, are limited to the protection of rights of property. The court is conversant only with questions of property and the maintenance of civil rights, and exercises no jurisdiction in matters merely political, illegal, criminal or immoral."

Our conclusion therefore is that the circuit court was without jurisdiction, and that its order imposing a fine upon the relator and ordering that he stand committed until the same was paid is void, as being *coram non judice.*

It is, however, suggested that the jurisdiction of a court of chancery may be sustained on the theory that Mr. Lorimer has a property right in his office and that the effect of the injunction would be to preserve his title thereto. While it is true an officer *de jure* has a property right in the emoluments of his office, and may sue for and recover the same in an action at law from an officer *de facto* who has collected them while in his possession of the office, (*Mayfield* v. *Moore*, 53 Ill. 428; *Kreitz* v. *Behrens-*

*meyer*, 149 id. 496; *City of Chicago* v. *Luthardt*, 191 id. 516;) a public office is not property, but a mere public agency created for the benefit of the State. In the American and English Encyclopedia of Law (vol. 23—2d ed.—p. 328,) it is said: "It is well settled in the United States that an office is not the property of the officeholder, but is a public trust or agency; that it is not held by contract or grant; that the officer has no vested right therein, and that, subject to constitutional restrictions, the office may be vacated or abolished, the duties thereof changed and the term and compensation increased or diminished. The fact that a constitution may forbid the legislature to abolish a public office or diminish the salary thereof during the term of the incumbent does not change the character of the office nor make it property. True, the restrictions limit the power of the legislature to deal with the office, but even such restrictions may be removed by constitutional amendment." The author, in support of the text, cites the following Illinois cases: *People* v. *Auditor*, 1 Scam. 537; *People* v. *Lippincott*, 67 Ill. 333; *People* v. *Wright*, 70 id. 388; *People* v. *Brown*, 83 id. 95; *Donahue* v. *Will County*, 100 id. 94; *Kreitz* v. *Behrensmeyer*, 149 id. 496; *People* v. *Kipley*, 171 id. 44. And the theory that ballots are like title deeds finds no support in reason or the authorities. The jurisdiction of a court of equity to preserve title deeds or evidence by bill to perpetuate testimony *de bene esse* or by way of discovery, is part, only, of the auxiliary jurisdiction of a court of chancery, and is exercised only in aid of pending suits. or suits about to be begun affecting property rights. If a court of chancery lacks primary jurisdiction to prevent a removal from office or over a contested election, or to prevent the casting of ballots or the counting of the same, or to control a procedure governing election contests, it certainly can have no auxiliary jurisdiction to prevent, by injunction, the ballots from being opened and the election being contested. To give it such auxiliary jurisdiction would

be to confer power over a shadowy incidental and at the same time deny to it jurisdiction over the substance which casts the shadow. If it were true that an unlawful counting of the ballots might destroy their evidentiary character, Mr. Lorimer's tenure of office would be rendered doubly safe, because if the ballots no longer existed as evidence, his certificate of office would conclusively protect him. Such contention, however, is without force, as the opening of the ballot-boxes and the production of the ballots, as called for by the subpoena, would no more destroy them as evidence than would the opening and production of ballots before the city council or county court in a contested election case over which such body or tribunal had conceded jurisdiction. The production of ballots in a contest where the same have been offered in evidence in some other contest merely requires proof that the ballots have not been tampered with. In *Perkins* v. *Bertrand,* 192 Ill. 58, which was a proceeding to contest an election to the office of supervisor of the town of North Chicago, the ballots had been opened in another contest which was pending before the city council of Chicago and involved an aldermanic office. This latter contest had been referred by the city council to the committee on election. That committee appointed a sub-committee of three to count the ballots. The board of election commissioners of Chicago was requested to produce the ballots before the sub-committee, and did so produce them. It appeared that during such re-count the ballots were not "mutilated, disfigured or in any manner changed, but were returned to said boxes in the same condition in which they were taken therefrom." The fact of such re-count was held not to affect the evidentiary character of the ballots in the contest of the election of the office of supervisor, and it was held that they were properly admitted as evidence in such contest.

If a court of chancery, in a case like this, can maintain jurisdiction to restrain the board of election com-

missioners from counting the ballots or canvassing the same or producing them in a contest, the functions and power of the election commissioners will have been destroyed. We are fully convinced a court of chancery is not possessed of such jurisdiction.

From what has been said it follows that the imprisonment and detention of the relator by virtue of the *mittimus* issued in pursuance of the order of the circuit court was without authority of law, and he is therefore discharged therefrom.                    *Relator discharged.*